# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| R.A.,<br><br>  Petitioner,<br><br>  v.<br><br>CHRIS HENN,<br><br>  Respondent. | Case No. 1:25-cv-00209-KES-EPG-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner R.A., represented by counsel, is proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

> In December 2020, appellant Ryan A., then 17 years old, was arrested for allegedly molesting a young child who was in the foster care of his mother. In January 2021, the Merced County District Attorney filed a juvenile wardship petition under Welfare and Institutions Code section 602, subdivision (a), alleging one count of committing a lewd or lascivious act upon a child under the age of 14 years, in violation of Penal Code section 288, subdivision (a). Appellant denied the allegation.
>
> In December 2022, following a contested jurisdictional hearing, the trial court sustained the allegation. In January 2023, the court declared appellant a ward of the court; ordered him confined for 23 days in the Juvenile Justice Correctional Complex, with credit for time served; and placed him under the supervision of a probation officer, with various terms and conditions.

In re Ryan A., No. F085649, 2023 WL 7034539, at *1 (Cal. Ct. App. Oct. 26, 2023) (footnote omitted).

On October 26, 2023, the judgment was affirmed. In re Ryan A., 2023 WL 7034539, at *9. On January 10, 2025, the California Supreme Court denied the petition for review. (ECF Nos. 8-10, 8-11.)

1

On February 14, 2025, Petitioner filed the instant federal petition for writ of habeas corpus, asserting that the "trial court's systematic exclusion of defense exculpatory evidence and denial of cross-examination of prosecution witnesses based on state law . . . violated R.A.'s Fifth and Fourteenth Amendment due process right and Sixth Amendment right to present a complete defense and his Sixth Amendment right to confrontation and cross-examination." (ECF No. 1 at 20.[1]) Respondent filed an answer, and (Petitioner filed a traverse. (ECF Nos. 9, 13.)

## II.

## STATEMENT OF FACTS[2]

**I. Prosecution Case**

**A. G.**

At the time of the jurisdictional hearing, G.L. was eight years old and about to enter third grade. She was living with A., whom she identified as her mother, and her four brothers, D., X., E. and J.[3] Prior to living with A., G. lived with M.; M.'s son, appellant; and her older brothers, D. and X. She was sometimes alone with appellant and "[h]e did bad things."

G. described one incident that occurred when she was lying down in her bedroom at M.'s house watching TV. Appellant closed the door, pulled his pants down, and pulled her pants down. Appellant was next to her on the bed and he moved her on top of him. She testified, "He started doing gross things, things I don't want to talk about." She then described feeling his private part touching her private part, and said she knew "he was going to do gross things." When asked by the prosecutor to mark the areas she was referring to as private parts on diagrams, she drew circles indicating her genitals and appellant's genitals. G. testified appellant did those things to her "[a] lot" before she moved from M.'s house to A.'s house.

On cross-examination, G. testified that she did not like living at M.'s house because of appellant, and that M. spanked her "[a] lot" with a belt or a "chancla." She also testified that D. saw what appellant did to her and X. saw "a little bit." G. explained she knew D. saw them and when he later asked her what was going on, she told him. X. also told G. that he saw them and he described to her what he saw. G. testified that after D. left M.'s house for A.'s house, he told A. what happened.[4] G. subsequently moved to A.'s house, too, and she then told A. what happened.

G. testified that she told one person that the incident with appellant never happened. She could not recall the person's name, but her denial occurred when

---

[1] Page numbers refer to the ECF pagination stamped at the top of the page.
[2] The Court relies on the California Court of Appeal's October 26, 2023 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
[3] At the time of the hearing, G. and her four brothers were using different first names than when they lived with M. and appellant.
[4] During her testimony, M. stated D. and X. were removed from her home in July 2019 and G. was removed in November 2019.

2

she was pointing to where appellant touched her on some drawings. She testified she was scared so she stated it never happened and nothing was wrong. G. did not recall speaking with a police officer, and she did not recall removing the clothing of two other foster children in the home. She denied she would remove her own clothing or remove the clothing of other children in the home.

### B. D.

G.'s brother, D., was 11 years old when he testified. He said that appellant sometimes babysat during the time D., G., X., and another brother lived at M.'s house. D. testified that he saw what appellant did to G. He knew appellant had gone into G.'s room and, after the movie he was watching on TV ended, he went in G.'s room, too. He saw G. was on top of appellant and appellant's private part was out. He recalled they were both clothed and they were lying down in the bed. He ran back to his room and told X.

D. did not tell any adults that day because he was scared M. was going to hit him, but he later told J. and A. after he moved to their house. He said that M. threw a shoe at him one time, and she spanked him and his siblings with her hand and with a sandal or a "chancla."

He also described one other incident in which he saw G. and appellant lying down. D. saw appellant had G.'s pants down and he told X. to look, but they did not see anything else. D. said he finally told A. after she saw he looked worried and asked him what was wrong. He told her that he had other siblings still at M.'s house and then disclosed to A. "the bad things that happened over there."

On cross-examination, D. remembered leaving M.'s house for a short time and going to a large house, where he felt sad.[5] He remembered being interviewed by someone about what he saw and being asked to draw what he saw. He said he told the woman the bad stuff appellant did, but answered, " 'I don't know,' " to some questions. D. denied he told a social worker that he did not see appellant do anything to G.

### C. Law Enforcement Testimony

Detective Zambrano was the lead investigator assigned to the criminal case, but he died between completing the investigation and the jurisdictional hearing. Zambrano was assisted by Detective Martinez, who testified. Martinez did not author any reports or interview any witnesses for the criminal case, as she was not the lead detective. She recalled the sheriff's department received a phone call about a sex crime in August 2019, and she explained that a report based on the call would have been sent electronically to the detectives' division.

Martinez testified that she was present along with Deputy Ortiz for the children's forensic interviews, but she did not interview the children or write the report. She also did not recall hearing G. tell the interviewer she had been molested 100 times or respond no when asked whether something happened that bothered her. Martinez explained that if a sexual assault is acute, meaning within the past 72 hours, they would take the victim directly to the hospital for a forensic exam, but if the assault occurred outside that window, they would not do so. She was

---

[5] M. later testified that in January 2019, D. and X. were moved to a new home out of the area before returning to her home.

3

unaware what occurred between the children's forensic interviews and appellant's arrest approximately 10 months later.

**II. Defense Evidence**

### A. Social Worker

Social worker Cristal X., formerly V., was the first witness called by the defense. She invoked official information privilege under Evidence Code section 1040, as well as Welfare and Institutions Code section 827. The trial court sustained the claim of official information privilege and precluded counsel from questioning her on any investigations she conducted in her official capacity, but took judicial notice that she was a mandated reporter.

### B. M.

M. testified that she used to work for agencies and became a foster parent in 2012. G. was in M.'s care from August 2017, when she was three years old, to November 2019, when she was five years old. G.'s brother, E., came with G. in 2017. In January 2019, D. and X. were removed from M.'s home for aggressive behavior and sent to a home out of the area, but she accepted them back 11 days later and they remained in her home until July 2019. G. remained with her until November 2019. She testified that D., X., and G. were all liars.

M.'s house had four bedrooms. She had her own room, E. shared a bedroom with Mi., G. shared a room with S., and appellant had his own room. When M. was asked if she could take D. and X., appellant moved in with his older brothers two blocks away. Approximately five other adults would visit the house per week, and no one reported suspecting appellant of child abuse. Nor did any of the children tell her that appellant was engaged in any inappropriate touching or behavior.

Based on information she received from the agency, M. had to have G. with her at all times because G. would take other children's clothes off. She also testified G. craved attention. She denied she and her partner ever had sex when the children were home. She said he did not live with her, and they would see each other when the children were at school.

Social services employees came to M.'s house on August 2, 2019. When they departed, they left G. in her care, and no one told her she needed to remove appellant because he presented a danger to G. based on inappropriate touching.

M. testified that D. accused her of hitting X., and after G. left her care, G. falsely accused her of physical abuse. The misdemeanor case against her was later dismissed by the district attorney after she succeeded in having her guilty plea withdrawn, which had been entered by her attorney without her knowledge and agreement.

### C. Law Enforcement Testimony

Officer Bethel, who worked for a police department in a different county at the time of the hearing, testified that when he was with the sheriff's department, he received a call for service from a child protective services worker on August 2, 2019, concerning appellant and he wrote a report. At his supervisor's direction, he contacted Detective Martinez, which ended his involvement in the matter.

4

Detective Ortiz listened in on the forensic interviews of G. and her two brothers, and he summarized the interviews in a report, which was the only case-related task he was given. He recalled G. reported there was penetration.

### D. Expert Testimony

Sandra Wilkinson testified for the defense as an expert in sexual assault examinations and forensic interviews. Wilkinson opined that G. should have been taken for a forensic examination after reporting penetration and the failure to do so was malpractice. She explained that while the first 120 hours is acute for the purpose of collecting DNA and documenting injuries, an examination of a nonacute assault would detect trauma to the hymen because it does not heal intact.

Wilkinson also testified that the forensic examinations in this case were very poorly done, and deficiencies included asking leading questions that contained information not already disclosed by G. and asking questions with multiple parts that resulted in unclear answers. Wilkinson described G. as "sexualized," meaning she had knowledge of things a typical three-or four-year-old would not, and Wilkinson said the greatest deficiency in the interview was the interviewer's failure to follow up on G.'s statements that the perpetrator did things like they do in movies and the interviewer's acceptance of G.'s description of penetration and what sounded like ejaculation. Wilkinson said these statements from a victim should elicit followup questions, and that because penetration of a young child is exceedingly painful, G.'s response that she did not remember when asked certain questions was "a huge red flag." Wilkinson found "the interview to be totally unhelpful." She said the state standard for forensic interviewing involves a specific 10-step process and although the forensic interviewer initiated the process, it failed because the interviewer quickly abandoned her efforts.

### E. Appellant

Appellant spoke with Cristal X. on August 2, 2019, for an investigation, but he was never interviewed by police. He was not arrested then, and he denied ever touching G. inappropriately. When social workers left that day, he remained in the home. He was later arrested in December 2020.

He testified that either his mother or his older brother was always at the house, and social workers, sometimes in multiples, came two or three times a week.

### F. G. and D.

G. testified that the bad thing appellant did to her occurred in her room and D. saw it. Neither she nor appellant was wearing any clothes, and she denied previously testifying appellant was wearing a shirt.[6] G. did not report what happened to the woman who came to M.'s house to interview her because appellant told her not to tell anyone, and she told only her mom she was in a lot of pain.

D. testified that he saw appellant with G. two times, once in his room and once in her room. The first time was in his room, when he and X. were in there watching

---

[6] The jurisdictional hearing took two days, with an almost five-month passage of time between the first day, when G. testified for the prosecution, and the second day, when she was called to testify by the defense.

5

> TV. Appellant came in and sat in front of D.'s bed. He called G., and D. and X. saw appellant and G. both had their pants down. G. saw D. watching and said, " 'Stop, [D.] You gotta stop, [D.]' "
>
> The second time was when D. went into G.'s room to tell appellant the movie he and X. were watching had ended. He saw G. on top of appellant and appellant's private part was out. He ran back to his room and stayed there.

Ryan A., 2023 WL 7034539, at *2–5 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged allegation arises out of the Merced County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala,

6

576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

(internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

AEDPA requires considerable deference to the state courts. Generally, federal courts "look through" unexplained decisions and review "the last related state-court decision that does provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 584 U.S. 122, 125 (2018). This presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

"When a federal claim has been presented to a state court[,] the state court has denied relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits and there is no reasoned lower-court opinion, a federal court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not *de novo* review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

## IV.

## REVIEW OF CLAIMS

In the petition, Petitioner asserts that the "trial court's systematic exclusion of defense exculpatory evidence and denial of cross-examination of prosecution witnesses based on state law . . . violated R.A.'s Fifth and Fourteenth Amendment due process right and Sixth

Amendment right to present a complete defense and his Sixth Amendment right to confrontation and cross-examination." (ECF No. 1 at 20.) Respondent argues that the state court's rejection of Petitioner's claim was not objectively unreasonable. (ECF No. 9 at 12.)

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Wilson, 584 U.S. at 125.

In denying Petitioner's claim, the California Court of Appeal stated:

**I. Procedural Background**

In April 2021, appellant filed a motion seeking pretrial discovery, in accordance with *Brady.* Among other items, appellant sought G.'s dependency case file, the sheriff department's reports, and the forensic interviews. A minute order from a hearing held on August 31, 2021, reflects that the parties informed the court they resolved their discovery dispute.[7]

It appears appellant also followed the legal procedure in place to obtain confidential juvenile records vis-à-vis filing a petition under section 827, although neither the petition nor the filing date appears in the record. On February 23, 2022, the trial judge, who presided over the jurisdictional hearing, ordered the petition be sent to dependency court for consideration. The disposition of appellant's petition by the dependency court does not appear in the record, but later references to section 827 during the jurisdictional hearing suggest that disclosure of information was denied, given the prosecutor's repeated objections and reference to "lack of a [section] 827 order."

During the jurisdictional hearing, defense counsel sought to question multiple witnesses about G.'s behavioral issues and a statement she made denying the molestation occurred; issues with G.'s brothers; the social worker's investigation into the allegation of sexual abuse and initial conclusion; the number and identity of service providers who visited the house; and the approximately 17-month delay between the social worker's call to law enforcement reporting the allegation and appellant's arrest for the crime. Most of the information sought was part of, or related to, G.'s and her brothers' dependency cases. The trial court limited many of counsel's questions under Welfare and Institutions Code section 827 and Evidence Code section 1040, and also rejected counsel's arguments that some of G.'s statements were admissible as admissions and for impeachment.

**II. Standard of Review**

We review a trial court's ruling on the admission or exclusion of evidence for abuse of discretion. (*People v. Kopatz* (2015) 61 Cal.4th 62, 85; *People v.*

---

[7] The Honorable Margaret Johnson.

9

*DeHoyos* (2013) 57 Cal.4th 79, 131.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Wilson* (2021) 11 Cal.5th 259, 304; accord, *People v. Chhoun* (2021) 11 Cal.5th 1, 26.) " '[W]e review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11; accord, *People v. Brooks* (2017) 3 Cal.5th 1, 39.) Further, "th[e] routine application of state evidentiary law does not implicate [the] defendant's constitutional rights" (*People v. Brown* (2003) 31 Cal.4th 518, 545, fn. omitted; accord, *People v. Thompson* (2016) 1 Cal.5th 1043, 1116), including the right to present a defense (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203, citing *People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103).

### III. Legal Principles

"Disclosure obligations in criminal proceedings are governed by both statutory procedures and federal constitutional due process rights. Penal Code section 1054.1 specifies the matters that the prosecution must disclose to the defense, including exculpatory evidence and felony convictions of material witnesses. (Pen. Code, § 1054.1, subds. (d), (e).) Although these statutory discovery procedures are expressly applicable only to criminal proceedings, the juvenile court has the discretion to apply them in juvenile delinquency proceedings as well. (*Clinton K. v. Superior Court* (1995) 37 Cal.App.4th 1244, 1248.) The *constitutional* disclosure obligations, which are delineated in *Brady* and its progeny, exist independently of these statutory procedures. (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 377–378.)

"To comply with *Brady* constitutional due process requirements, the prosecution must disclose exculpatory and impeachment evidence that is favorable to the accused and material on the issue of guilt or punishment. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042; *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 7.) Broadly speaking, exculpatory evidence is evidence that tends to exonerate the defendant from guilt. (See *Kennedy v. Superior Court* (2006) 145 Cal.App.4th 359, 377.) The impeachment component includes evidence that might undermine a prosecution witness's credibility. (*People v. Webb* (1993) 6 Cal.4th 494, 518; *City of Los Angeles v. Superior Court, supra*, 29 Cal.4th at p. 16; *People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 51 [evidence favorable to the accused is ' "evidence that the defense could use either to impeach the state's witnesses or to exculpate the accused" '].) Disclosure may be required even when the evidence is subject to a state privacy privilege, as is the case with confidential juvenile records. (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 57–58 (*Ritchie*); see *Webb, supra*, at p. 518.) The *Brady* disclosure requirement applies to juvenile delinquency proceedings as well as criminal proceedings. (*Joe Z. v. Superior Court* (1970) 3 Cal.3d 797, 806, fn. 5; see *Robert S. v. Superior Court* (1992) 9 Cal.App.4th 1417, 1423.)" (*J.E., supra*, 223 Cal.App.4th at pp. 1334–1335, fn. omitted.)

Under state law, "Evidence Code section 1040, subdivision (b)(2), authorizes the trial court to decline to disclose confidential records maintained by a public entity when it finds the 'necessity for preserving the confidentiality of the information ... outweighs the necessity for disclosure in the interest of justice.' " (*People v. Landry* (2016) 2 Cal.5th 52, 73.) Further, "Section 827 of the Welfare and Institutions Code contains protections concerning the confidentiality of juvenile records, whether or not they are covered by other state or federal privileges, and

vests the juvenile court with exclusive authority to determine the extent to which those records may be released to third parties." (*People v. Nieves* (2021) 11 Cal.5th 404, 432, citing § 827 & *T.N.G. v. Superior Court* (1971) 4 Cal.3d 767, 778; accord, *Jenkins, supra*, 14 Cal.5th at p. 524; *Lorenza P. v. Superior Court* (1988) 197 Cal.App.3d 607, 610–611.)

"There is a strong public policy of confidentiality of juvenile records (*In re Keisha T.* (1995) 38 Cal.App.4th 220, 231), and section 827 et seq. set forth detailed provisions to protect this confidentiality. Section 827 specifies who is authorized to inspect the files, and it lists the prosecutor as one of the authorized persons. An authorized person, in turn, may not disclose information from the files to an unauthorized person without a court order. (§ 827, subd. (a)(4), (5); see *T.N.G. v. Superior Court* (1971) 4 Cal.3d 767, 780–781; *In re Keisha T., supra*, 38 Cal.App.4th at p. 234.)" (*J.E., supra*, 223 Cal.App.4th at p. 1337, fns. omitted.)

"Section 827 also contains provisions that permit unauthorized persons to directly petition the juvenile court for access to the confidential records. (§ 827, subd. (a)(1)(P); *R.S. v. Superior Court* (2009) 172 Cal.App.4th 1049, 1053–1054.) Under section 827 the juvenile court has 'exclusive authority to determine whether and to what extent to grant access to confidential juvenile records' to unauthorized persons. (*In re Elijah S.* [(2005)] 125 Cal.App.4th [1532,] 1541.) This statutory scheme reflects a legislative determination that the juvenile court has 'both the " 'sensitivity and expertise' to make decisions about access to juvenile records." ' " (*J.E., supra*, 223 Cal.App.4th at p. 1337, fn. omitted, quoting *People v. Superior Court* (2003) 107 Cal.App.4th 488, 491; accord, *Jenkins, supra*, 14 Cal.5th at p. 524.)

"To support a section 827 petition, the petitioner is required to make a good cause showing warranting the in camera review. (Rule 5.552(c)(2).) The court is then required to engage in a careful balancing of the competing interests when making its disclosure decision. The court's duty 'is to "balance the interests of the child and other parties to the juvenile court proceedings, the interests of the petitioner, and the interests of the public." ... To do so, the court "must take into account any restrictions on disclosure found in other statutes, the general policies in favor of confidentiality and the nature of any privileges asserted, and compare these factors to the justification offered by the applicant" in order to determine what information, if any, should be released to the petitioner.' " (*J.E., supra*, 223 Cal.App.4th at pp. 1337–1338, fn. omitted, quoting *People v. Superior Court, supra*, 107 Cal.App.4th at p. 492 & citing rule 5.552; accord, *Jenkins, supra*, 14 Cal.5th at pp. 524–525.)

**IV. Analysis**

As stated, the subject matter of the evidence sought by appellant, both documentary and testimonial in form, related to the agency's initial investigation and determination regarding the allegation that G. had been molested by appellant, including statements made by G. and others during the course of that investigation, the social worker's call to law enforcement, and law enforcement's response. All of this information was contained in, or generated in the context of, G.'s dependency case, and possibly the dependency cases of her brothers. During the jurisdictional hearing, the trial court sustained the prosecutor's objections to certain documents and lines of questioning under Welfare and Institutions Code section 827 and Evidence Code section 1040.

Appellant's claim of entitlement to reversal based on the erroneous exclusion of evidence relies on a mischaracterization of his right to access and to disseminate confidential information from juvenile case files; and his contention that "it is unclear how or why the prosecutor and the juvenile court were so convinced section 827 forbid[s] the defense from independently introducing any and all information that was also contained in the siblings' dependency files" is undercut by both the law and the record in this case. The confidentiality of juvenile records and proceedings must be balanced against the rights of those criminally accused to disclosure of exculpatory and impeachment evidence. (*Jenkins, supra*, 14 Cal.5th at pp. 504–505, 524–526; *J.E., supra*, 223 Cal.App.4th at pp. 1334–1337.) As discussed, the record reflects a petition was filed under section 827 and the trial court referred it to dependency court, in accordance with the proper procedure for seeking confidential information contained in juvenile case files. Resolution of that matter rested exclusively with the dependency court. (*Jenkins, supra*, at p. 524; accord, *J.E., supra*, at pp. 1337–1338.) Notably, appellant does not claim a *Brady* violation, and he makes no mention of his petition or its resolution. (*Pack v. Kings County Human Services Agency* (2001) 89 Cal.App.4th 821, 826, fn. 4 (*Pack*)["The petition for review of juvenile court records is a special proceeding on a collateral matter," and "[a]n order denying the petition is appealable as a final judgment in a special proceeding."], citing *In re Keisha T.* (1995) 38 Cal.App.4th 220, 229 (*Keisha T.*).)

Appellant asserts that "the defense already rightfully had access to much of the information, because this was a juvenile case 'involving the' *accusing* 'minor(s),' " and he reasons that "[b]ecause everyone in the room was entitled to access the confidential information, nothing in section 827 barred the defense's introduction of evidence or the impeachment of witnesses with information simply because it was also contained in a dependency file and/or related to the actions of a social worker." (Italics added.) appellant is incorrect.

A juvenile case file may be inspected by "The attorneys for the parties, judges, referees, other hearing officers, probation officers, and law enforcement officers *who are actively participating in criminal or juvenile proceedings involving the minor.*" (§ 827, subd. (a)(1)(E), italics added.) In the context of case file access under section 827, the minor was G., or her brothers, not appellant, and given that appellant was not a party in the underlying dependency proceedings, his defense counsel did not have the right to inspect the juvenile case files absent a court order. (§ 827, subd. (a)(1)(Q); *Keisha T., supra*, 38 Cal.App.5th at p. 232; see *Lorenza P. v. Superior Court, supra*, 197 Cal.App.3d at p. 611 [criminal defense counsel for mother of minors had right to review minors' underlying dependency records without a court order because mother was a party to the dependency proceeding].) Moreover, a right of inspection by an authorized person does not equate to a right to freely disseminate the information to third parties. (*Jenkins, supra*, 14 Cal.5th at p. 524; accord, *J.E., supra*, 223 Cal.App.4th at p. 1337; *Keisha T., supra*, at pp. 233–234.) "[A]llowing individuals with access to juvenile court records ... to disseminate them[ ] would turn the expressed policy of confidentiality on its head." (*Keisha T., supra*, at p. 234, citing *In re Tiffany G.* (1994) 29 Cal.App.4th 443, 451.)

As explained, the procedures under section 827 " 'protect both the defendant's right to a fair trial and the state's interest in confidentiality of the files' " (*Jenkins, supra*, 14 Cal.5th at p. 525, quoting *J.E., supra*, 223 Cal.App.4th at p. 1338), and that is the " 'proper mechanism to resolve a defense *Brady* disclosure request involving information in a juvenile file' " (*Jenkins, supra*, at p. 524, quoting *J.E, supra*, at p. 1338). Here, appellant has not shown that he obtained a section 827

> order from the dependency court permitting him to obtain and disclose information from dependency case files, and that the trial court thereafter excluded the evidence, in contravention of the order. Contrary to appellant's position that the trial court erred, the record reflects a section 827 petition was filed and transferred to the dependency court for resolution. Appellant does not acknowledge this referral, let alone challenge it, but any claim of error related to that underlying decision would be subject to timeliness and forfeiture principles. (*Pack, supra*, 89 Cal.App.4th at p. 826, fn. 4.) To the extent appellant's argument is interpreted as claiming the trial court had the authority to simply admit the evidence because the court was presiding over a juvenile wardship proceeding, that position, too, neglects to account for the requisite petition and disclosure order process under section 827.
>
> " 'Appellate jurisdiction is limited to the four corners of the record on appeal ....' " (*People v. Waidla* (2000) 22 Cal.4th 690, 743, quoting *In re Carpenter* (1995) 9 Cal.4th 634, 646.) "On appeal, we presume that a judgment or order of the trial court is correct, ' "[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." ' " (*People v. Giordano, supra*, 42 Cal.4th at p. 666.) The moving party bears the burden of demonstrating error on appeal (*People v. Gamache, supra*, 48 Cal.4th at p. 378), including providing an adequate record for review (*People v. Moore* (2021) 68 Cal.App.5th 856, 866). " '[A]ny uncertainty in the record must be resolved against the defendant.' " (*Ibid.*, quoting *People v. Sullivan* (2007) 151 Cal.App.4th 524, 529 & citing *People v. Chubbuck* (2019) 43 Cal.App.5th 1, 12.)
>
> Appellant has not met his burden of demonstrating error on appeal. In the absence of any evidence that appellant obtained an order via the petition process under Welfare and Institutions Code section 827, his claim that the trial court erred in excluding the evidence under section 827 and Evidence Code section 1040 necessarily fails.[8]

Ryan A., 2023 WL 7034539, at *5–9 (footnotes in original).

The Court need not determine whether the state court reasonably applied clearly established federal law on the right to present a complete defense and the right to confrontation if Petitioner has failed to carry his burden under Brecht. See Brown v. Davenport, 596 U.S. 118, 140 (2022) ("When a federal court determines . . . that a petitioner has *failed* to carry his burden under *Brecht*, that conclusion subsumes (or perhaps more precisely, obviates the need for) a

---

[8] Appellant sought to introduce some of the disputed evidence on grounds of impeachment and admissions. While these grounds do not supplant the need to comply with section 827, we discern no fault with the court's additional determinations that G.'s out-of-court statements made during the dependency case investigation were admissible neither for impeachment nor as admissions. G. admitted in her testimony that she denied the molestation allegation at one point when asked about it. (Evid. Code, § 1235; *People v. Johnson* (1992) 3 Cal.4th 1183, 1219 ["The 'fundamental requirement' of [Evidence Code] section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony."].) Further, she was not a party to the juvenile wardship petition brought against appellant. (Evid. Code, § 1220.) Nor do we discern any apparent error with the trial court's rulings on grounds of hearsay or relevance.

13

separate AEDPA inquiry; relief must be denied."); Burgos v. Madden, 81 F.4th 911, 916 (9th Cir. 2023).

"*Brecht*'s inquiry is whether the trial error had a 'substantial and injurious effect or influence' on the verdict, and relief is proper only if the court has 'grave doubt'[9] about whether the error had that effect." Brown v. Att'y Gen. for State of Nevada, 140 F.4th 1069, 1077 (9th Cir. 2025) (footnote added) (first quoting Brecht, 507 U.S. at 623; then quoting Davis v. Ayala, 576 U.S. 257, 267–68 (2015)). "The defendant must show the trial error resulted in 'actual prejudice.' This stringent standard recognizes 'the presumption of finality and legality that attaches to' state convictions and that most constitutional errors are harmless." Brown, 140 F.4th at 1077 (quoting Brecht, 507 U.S. at 637, 633). "The reviewing court does not summarily ask whether adequate evidence supports the verdict despite the error; rather, it 'quantitatively assesse[s]' the error in the context of the whole case." Brown, 140 F.4th at 1077 (quoting Arizona v. Fulminante, 499 U.S. 279, 307–08 (1991)).

Petitioner specifies the following actions that "thwarted [R].A. a meaningful opportunity to present a complete defense":

> 1. The Defense was prevented from asking social worker Cristal Xiong (formerly Cristal Vang), on direct examination, any questions relevant to her investigation; 2. The Court prevented Monica Sanchez,[10] on direct examination, from answering if Sanchez was told G. needed to be treated differently than other children, whether Sanchez knew, in advance of G. arriving in her home, that G. had a habit of removing her clothes and other children's clothes – including her brothers', and whether she knew about G's proclivities and when she learned them; 3. The Court further prevented Sanchez, on direct examination, from testifying regarding social worker visits to the home, including who came and how often, and from speaking about Xiong's interview with G., that Sanchez was present for; 4. The Court prevented Officer Bethel, on direct examination, from testifying about the phone report he took from Xiong; and 5. The Court prevented the Defense's expert witness, Sandra Wilkinson, on direct

---

[9] "By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." O'Neal v. McAninch, 513 U.S. 432, 435 (1995). "We conclude that the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (*i.e.,* as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." Id.

[10] Sanchez is Petitioner's mother and was referred to as "M." in the California Court of Appeal's opinion.

> examination, from testifying to the interviews conducted with G., where she and her siblings apparently denied what happened.

(ECF No. 13-1 at 1–2 (footnote added) (citations omitted).) Additionally, Petitioner specifies the following actions "denied [R].A. his right to confrontation": (1) the trial court not permitting "G. to answer, on cross-examination, if she remembered speaking with Xiong, whether she remembered speaking to a person named Karen Smith, a CASA representative, and what adult(s) she had spoken to when previously denying anything took place"; and (2) the trial court not permitting "Detective Martinez, on cross-examination, to answer if she knew whether service providers were sent to the Sanchez home." (ECF No. 13-1 at 2.)

Respondent contends that "none of this evidence would have changed the outcome of the juvenile proceeding" because: (1) "evidence of D. or G.'s prior statements and denials were cumulative to D. and G.'s testimony on the stand"; and (2) any facts or opinions "about the merits of the HSA [Human Service Agency] investigation . . . were peripheral to the victim's actual statements and the eyewitness account of D." (ECF No. 9 at 21.) Respondent argues:

> The factfinder—the trial judge—explicitly stated that in this case he did not find the opinions or actions of the social workers significant in the face of the testimony from the actual victim:
>
> > I've done enough dependency work to know they [social workers] don't always get it right. They don't. I mean, I don't know what the delay was about with the S.O. I don't know how long it took to investigate or why. I agree with you. . . . But, nevertheless, it was filed, and based upon the evidence and testimony presented, the Court does find the allegation to be true. And I make that finding beyond a reasonable doubt.

(ECF No. 9 at 21–22 (quoting ECF No. 8-2 at 555).) Petitioner argues that "there is ample room to question whether the court ruled on the evidence presented to them or their experience on the bench." (ECF No. 13-1 at 5.)

With regard to excluded evidence of G.'s prior statements and denials that abuse occurred, G. testified that she previously told one adult that this never happened because she felt scared. (2 RT[11] 351–52, 356–57.) Although the trial court prevented Sanchez from answering if

---

[11] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent. (ECF No. 8.)

15

she "was told G. needed to be treated differently than other children, whether Sanchez knew, in advance of G. arriving in her home, that G. had a habit of removing her clothes and other children's clothes – including her brothers', and whether she knew about G's proclivities and when she learned them," (ECF No. 13-1 at 1–2 (citations omitted)), Sanchez did testify that she treated G. differently "[i]n light of the information that [she was] given by Merced County." (2 RT 421.) Sanchez specified that she treated G. differently by having G. with her at all times, separate from the children, because G. would take off her own clothes and the clothes of other children. (2 RT 422–23.) Sanchez also testified that G. craved attention. (2 RT 425.) As to excluded evidence of the Human Service Agency's initial investigation, not permitting "Detective Martinez, on cross-examination, to answer if she knew whether service providers were sent to the Sanchez home," and "prevent[ing] Sanchez, on direct examination, from testifying regarding social worker visits to the home, including who came and how often," (ECF No. 13-1 at 2), the trial court suggested alternative phrasing, which allowed Sanchez to testify that about five professional adults would visit her residence in a week and to her knowledge none of them reported any suspected child abuse involving Petitioner. (2 RT 433–34.) Petitioner testified that on August 2, 2019, he spoke with Cristal X. for an investigation and after the social workers left, Petitioner was still allowed to be in the house and was not arrested until December 31, 2020. (2 RT 527–28.) Petitioner also testified that social workers, at times multiple social workers, came two or three times a week to his mother's house. (2 RT 531–32.)

Although Petitioner was prevented from introducing evidence regarding the HSA's initial investigation, defense counsel was able to elicit testimony that G. previously denied any abuse occurred, multiple social workers came to the house two or three times a week, an investigation occurred on August 2, 2019, and Petitioner was allowed to stay at the house for another year and four months thereafter. Defense counsel may have been encumbered by Evidence Code section 1040 and Welfare and Institutions Code section 827, but for each of the instances that Petitioner specified as violating his right to confrontation and to present a complete defense, counsel was able to elicit pertinent testimony, albeit not in the manner and to the extent the defense might wish.

Additionally, as noted by Respondent, the factfinder in this case, the trial judge, "explicitly stated that in this case he did not find the opinions or actions of the social workers significant in the face of the testimony from the actual victim." (ECF No. 9 at 21; 2 RT 554–55.) The Court does not find persuasive Petitioner's argument that he has established prejudice because "there is ample room to question whether the court ruled on the evidence presented to them or their experience on the bench." (ECF No. 13-1 at 5.) Petitioner has not shown causation between the alleged constitutional violations Petitioner has raised in his petition—the exclusion of defense evidence and denial of cross-examination of witnesses depriving Petitioner of his right to confrontation and to present a complete defense—and the purported prejudice of the trial court ruling based on "their experience on the bench." The prejudice of the court ruling based on "their experience on the bench" rather than on the evidence presented implicates a claim that Petitioner has not raised.

Assuming that violations of Petitioner's right to confrontation and to present a complete defense occurred, and quantitatively assessing the presumed errors in the context of the whole case, Brown, 140 F.4th at 1077, the Court finds Petitioner has not met the stringent standard of showing that the errors resulted in actual prejudice given (1) defense counsel was able to elicit pertinent testimony for each of the instances that Petitioner specified as violating his right to confrontation and to present a complete defense, and (2) the factfinder's statements regarding G.'s credibility and the lack of weight given to the opinions or actions of social workers. The presumed errors did not have a "substantial and injurious effect or influence" on the verdict. Brecht, 507 U.S. at 623.

## V.

## RECOMMENDATION

Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within

1 **FOURTEEN (14) days** after service of the Findings and Recommendation, any party may file written objections, **no longer than fifteen (15) pages, including exhibits**, with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **October 20, 2025**            /s/ Erica P. Grosjean
                                        UNITED STATES MAGISTRATE JUDGE